**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **KURT ALAN BOGGS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 14 C 536** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

MICHAEL T. MASON, United States Magistrate Judge:

Claimant Kurt Alan Boggs ("Boggs" or "Claimant") brings this motion for summary judgment [14] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Boggs' claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner has filed a cross-motion for summary judgment [22], asking that this Court uphold the decision of the Administrative Law Judge. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

**I. BACKGROUND**

**A. Procedural History**

Boggs filed his application for period of disability and disability insurance benefits on October 26, 2011 alleging an onset of disability of November 22, 2009 due to a stroke and neck and shoulder problems. (R. 157-61.) His application was denied

initially on March 1, 2012, and again upon reconsideration on May 23, 2012. (R. 89-93, 98-101.) Boggs filed a request for a hearing and appeared with counsel by video before Administrative Law Judge ("ALJ") Lee Lewin on September 18, 2012. (R. 20-86.) Also present at the hearing were a vocational expert and medical expert. On October 1, 2012, the ALJ issued a written decision denying Boggs' request for benefits (R. 6-16.) Boggs filed a timely request for review with the Appeals Council, which was denied on November 25, 2013. (R. 1-5.) At that time, the ALJ's decision became the final decision of the Commissioner. This action followed and the parties consented to the jurisdiction of this Court.

### B. Medical Evidence

#### 1. Treating Physicians

On November 21, 2009, Boggs, then age 55, presented to the ER at Provena St. Joseph Medical Center ("St. Joseph") with left face tingling, left arm weakness, and difficulty finding his words. (R. 275.) Symptoms had started a few weeks prior. (*Id.*) He had initially presented to another hospital when the symptoms began, but signed out against medical advice. (*Id.*) His sister told the ER doctor at St. Joseph that Boggs drank heavily, though Boggs reported only occasional alcohol consumption. (*Id.*) He was also a smoker, telling one doctor that he had smoked half a pack to three-quarters of a pack per day since he was fifteen years old. (R. 251.)

Upon arrival at St. Joseph, Boggs' blood pressure was 232/121. (R. 275.) The ER doctor noted facial palsy. (*Id.*) A chest x-ray was normal. (R. 263, 276.) An EKG showed normal sinus rhythm, but a right bundle branch block and occasional premature ventricular contractions were observed. (R. 271, 276.) A CT revealed questionable

right parietal infarct.  (R. 264, 276.)  Boggs was given a Labetalol drip to help lower his blood pressure and was admitted to the ICU for further testing for a possible TIA or stroke.  (R. 276.)

During his admission, Boggs underwent a neurological consultation and testing. (R. 249-50.)  He continued to display left facial weakness and slurred speech, as well as mild weakness of the left upper extremity and left hip flexor.  (R. 247, 249, 251-52.)  An MRI of the brain showed "a large area of restricted diffusion in the subcortical and deep white matter of the right parietal lobe consistent with an acute infarction."  (R. 269.)

Over the course of his admission, Boggs' blood pressure improved with the Labetalol drip.  (R. 254.)  An echocardiogram showed mild concentric left ventricular hypertrophy, but normal left ventricular ejection fraction at 65%.  (R. 272.)  A carotid ultrasound was normal.  (R. 267-68.)  The consulting cardiologist assessed a history of malignant hypertension, uncontrolled.  (R. 255.)  She recommended starting Boggs on oral blood pressure medication and that he eventually undergo a stress test.  (*Id.*)  She also recommended that he quit smoking.  (*Id.*)  Another physician assessed COPD, though the record does not include pulmonary function testing.  (R. 247.)

At a consultation with a rehabilitation doctor during his admission, Boggs said he lived alone and had been independent with activities of daily living and mobility.  (R. 251.)  He had been laid off as a fire truck mechanic.  (*Id.*)  A physical exam again showed left facial weakness, left hip flexor weakness, and mildly dysarthric speech.  (R. 252.)  The doctor opined that Boggs had mobility and ADL impairments secondary to his stroke and recommended physical therapy, occupational therapy, and speech pathology.  (*Id.*)  He noted that Boggs' symptoms seemed to be improving and did not

3

anticipate the need for inpatient rehabilitation.  (*Id.*)

On November 24, 2009, Boggs was cleared by cardiology to be discharged.  (R. 244.)  Although his symptoms of weakness had improved, he had not yet been cleared by neurology.  (*Id.*)  Boggs became very anxious and left the hospital against medical advice before consulting with neurology.  (*Id.*)  His discharge diagnoses were noted as (1) cerebrovascular accident (or stroke), (2) malignant hypertension, (3) COPD, and (4) dysarthria.  (*Id.*)  The record does not contain any documentation of immediate follow-up care after the hospital admission.

On May 9, 2011, Boggs was brought by ambulance to St. Joseph after his mother called 911 due to heavy alcohol consumption.  (R. 278.)  Boggs admitted to drinking four beers and two shots that day and to daily consumption of three or four beers, but denied a history of alcohol abuse.  (*Id.*)  He denied suicidal or homicidal thoughts, headaches, dizziness, chest pain, shortness of breath, abdominal pain, nausea, or speech difficulties.  (*Id.*)  He reported smoking a pack of cigarettes per day. (*Id.*)  His past medical history included hypertension (though he was not on blood pressure medication at the time), COPD, and stroke.  (*Id.*)

A physical examination was normal other than an elevated blood pressure.  (R. 278-79.)  His blood alcohol content was 0.19%.  (R. 281.)  An EKG showed no significant changes from the November 2009 EKG.  (R. 279, 282.)  The ER physician diagnosed alcohol intoxication related to alcoholism, hypertension, and polycythemia due to an elevated hemoglobin count.  (R. 279-80.)  Boggs was given Clonidine in the ER and prescribed Lisinopril, both used for treating high blood pressure.  (R. 279.)  He

was discharged and advised to follow up with his personal physician and seek treatment from an addiction specialist. (*Id.*)

Boggs began treatment with Dr. Philomena Francis on May 12, 2011. (R. 284.) At his first visit, Boggs described the results of his recent EKG, as well as his history of hypertension and stroke with associated left-sided weakness. (R. 287.) Boggs reported consuming six drinks a day. (*Id.*) Upon physical examination, Dr. Francis found elevated blood pressure and noted that his face was red and congested. (*Id.*) A musculoskeletal examination was normal, with full range of motion of the back and upper and lower extremities. (R. 288.) Gait and motor strength were noted as normal. (*Id.*) Dr. Francis described his mood as anxious and depressed. (*Id.*) Blood testing showed elevated glucose and LDL cholesterol levels. (R. 289.) Dr. Francis assessed polycythemia secondary to smoking, hypertension, a ventral hernia, severe alcoholism, nicotine addiction, and left-sided weakness post stroke. (R. 285.) She prescribed Thiamine and Librium (used to treat alcohol withdrawal), and continued him on Lisinopril. (*Id.*)

An office note dated August 23, 2011 reveals that Boggs' sister told Dr. Francis that Boggs was scheduled for a neurological consultation in the upcoming weeks. (R. 286.) The record does not include documentation of such a visit.

In November 2011, Boggs saw Dr. Michael Cichon, who appears to be a colleague of Dr. Francis. (R. 332.) His blood pressure was 134/96. (*Id.*) Dr. Cichon considered changing Boggs to calcium blockers and increasing his Lisinopril dosage. (*Id.*)

Boggs returned to see Dr. Francis on March 26, 2012 for a general check-up and

medication review.  (R. 308.)  He was still taking Lisinopril, but claimed it was not working as well because his blood pressure had "been running 150/90."  (*Id.*)  He continued to smoke a pack of cigarettes per day and consumed three drinks per day.  (R. 308-09.)  His blood pressure was 158/98.  (R. 308.)  Apart from blood pressure, weight, and height, it appears that the physical examination portion of the medical form was not completed on this visit.  (*Id.*)  Dr. Francis assessed uncontrolled hypertension and commented on left-sided weakness due to the stroke.  (R. 309.)  She advised Boggs to exercise in the pool during the upcoming summer to strengthen his muscles.  (*Id.*)

On April 6, 2012, Dr. Francis completed a Physical Residual Functional Capacity ("RFC") Questionnaire.  (R. 318-22.)  According to Dr. Francis, she had seen Boggs three times over a period of ten months.  (R. 318.)  She documented her diagnoses as (1) left-sided hemiparesis secondary to stroke, (2) history of severe alcoholism, and (3) uncontrolled hypertension.  (*Id.*)  The prognosis was poor.  (*Id.*)  Dr. Francis stated that Boggs denied any pain or dizziness, but sometimes suffered from poor balance on the left side.  (*Id.*)  She elaborated that Boggs had weakness on the whole left side especially in his left lower limb, and that the strength in his left shoulder and elbow was poor.  (*Id.*)  As a result, Boggs could not perform functions that required assistance from the left side.  (*Id.*)

In Dr. Francis' opinion, Boggs could only perform a low stress job because he had anxiety when he was not drinking.  (R. 319.)  He could walk four city blocks before needing to rest, sit for thirty minutes at a time, and stand for fifteen minutes at a time.  (*Id.*)  Dr. Francis did not understand the question asking how many total hours Boggs

could sit in an eight-hour workday and left that question blank.  (R. 320.)  She did opine that Boggs would need to walk around for fifteen minutes every forty-five minutes during the workday, and would require a job that permits shifting positions at will.  (*Id.*)  Boggs would not require unscheduled breaks, to elevate his legs, or a cane or other assistive device.  (*Id.*)  Dr. Francis concluded that Boggs could frequently lift up to ten pounds, but could never lift more than twenty pounds.  (*Id.*)  He could only occasionally turn his head, twist or stoop, could rarely climb stairs, and could never crouch, squat or climb ladders.  (R. 321.)  Lastly, Dr. Francis concluded that Boggs would have more than four "bad days" per month.  (*Id.*)

### 2.  Consulting Physicians

On February 4, 2012, Boggs underwent a consultative exam with Dr. Stanley Simon.  (R. 296-99.)  When describing his medical history, Boggs explained that he had suffered a stroke two years prior, during which he developed a tingling sensation in the left side of his face and left hand and lost dexterity in his left arm and hand.  (R. 296.)  Physical therapy helped alleviate some symptoms, though he still suffered from left hand and left leg weakness and poor balance.  (*Id.*)

Boggs reported he started suffering from stiffness in the neck about a year prior.  (*Id.*)  At the time of the exam, he still suffered from mild, intermittent neck pain, which he rated a 4/10 and which was exacerbated by moving his head.  (*Id.*)  Boggs also reported that he has had intermittent shoulder pain for many years, but denied any trauma to the shoulders.  (R. 297.)  He rated the pain a 7/10 and explained that it was exacerbated by reaching over his head.  (*Id.*)  Boggs said that both his neck and shoulder pain were

alleviated with pain medication.  (R. 296-97.)

Boggs denied any difficultly walking, standing, or sitting, but said he could only lift thirty pounds due to his left arm weakness.  (R. 297.)  He had no limitation with his right arm.  (*Id.*)  Boggs could climb stairs slowly.  (*Id.*)  He can bathe and dress himself and is able to drive.  (*Id.*)  He told Dr. Simon that he had completed junior college and worked until February 2011 as a fire truck mechanic.  (*Id.*)  Boggs said he smokes less than a half a pack of cigarettes per day and drinks less than a beer per week.  (*Id.*)

Upon physical examination, Boggs' blood pressure was 167/110.  (R. 297.)  Dr. Simon noted tenderness of the cervical spine, as well as decreased range of motion upon flexion, rotation, and side bending.  (R. 297-98.)  His lungs were clear and cardiac sounds were normal.  (R. 298.)  Boggs exhibited tenderness of the left shoulder and decreased range of motion upon flexion.  (*Id.*)  Abduction, internal and external rotation were full but with pain.  (*Id.*)  Range of motion was otherwise normal in the right shoulder, elbows, wrists, hips, knees, ankles, and lumbar spine.  (*Id.*)

Boggs could get on and off the exam table without difficulty and walk greater than fifty feet without support.  (R. 298.)  His gait was non-antalgic without the use of assistive devices.  (*Id.*)  While heel/toe walking, Boggs showed slight imbalance.  (*Id.*)  His grip strength was normal in both hands.  (*Id.*)  Straight leg testing was negative bilaterally.  (*Id.*)  Dr. Simon saw no neurological defects and motor strength was 5/5 in all limbs.  (*Id.*)  The Romberg's test was negative.  (*Id.*)  A mental status exam yielded normal results and Dr. Simon concluded that Boggs could manage his own funds.  (R. 298-99.)

In the impression section, Dr. Simon identified history of stroke, chronic neck

pain, chronic left shoulder pain, and hypertension as problems.  (R. 299.)  He urged Boggs to follow up with his primary care physician regarding his blood pressure.  (*Id.*)

Dr. George Andrews reviewed the record and completed a Physical RFC Assessment on February 25, 2012.  (R. 300-07.)  Dr. Andrews concluded that Boggs could occasionally lift fifty pounds, frequently twenty-five; could stand and/or walk for a total of six hours in an eight-hour day; could sit for a total of six hours in an eight-hour day; and had no limitations on pulling or pushing.  (R. 300.)  He based these conclusions on the results of the consultative exam, as well as Boggs' own statements to Dr. Simon that he had no trouble standing, walking, or sitting, and could lift thirty pounds.  (*Id.*)  Dr. Andrews also concluded that Boggs could only occasionally balance or climb ladders, ropes, or scaffolds due to the limited range of motion observed by Dr. Simon and Boggs' continued complaints of balance problems.  (R. 302.)  Similarly, he limited Boggs to only frequent overhead reaching with the left upper extremity and stated that he must avoid concentrated exposure to hazards such as moving machinery and heights.  (R. 303-04.)  He found no other postural, manipulative, visual, communicative, or environmental limitations.  (R. 302-04.)

Dr. Andrews commented on the discrepancies between Boggs' claimed activities of daily living and his statements and performance at the consultative exam.  (R. 305.)  On the whole, he found Boggs to be only partially credible given the medical evidence of record.  (*Id.*)  At the time of Dr. Andrews' review, there was no medical source statement regarding Boggs' physical capacities in the record.  (R. 306.)  Dr. Andrews' RFC assessment was affirmed on reconsideration.  (R. 323-25.)

### C.  Claimant's Testimony

Boggs appeared with counsel at the hearing before the ALJ and testified as follows. At the time of the hearing, he was 58 years old, 5' 9" tall, and weighed 190 pounds. (R. 28.) He is right handed. (*Id.*)

From 1980 to 1997, Boggs testified that he worked as a fire truck salesman. (R. 54.) That position involved lots of physical activity because customers wanted to see how the truck worked and see the engine compartment, which weighed about 100 pounds. (R. 54.) The position also required typing skills and computer work. (R. 55.)

Boggs worked for a home and auto repair company from 2004 until 2008. (R. 35.) He worked as a fire truck mechanic from February 2008 until December 2008, when he was laid off. (R. 35-36.) He returned to work for the same company from February 2009 until October 2009 when he had his stroke and was laid off again. (R. 39-41.) Following his stroke, Boggs did not work until March or April 2011 when he worked for a week as a fire truck mechanic. (R. 30-31, 41.) He stopped working after a week when he was told he could not do the job because he could not climb or do heavy lifting. (R. 31.) He explained that he could not change the belts, climb on top of the truck, or lay down to perform work on the pump compartment due to problems with his left hand and his left leg. (*Id.*)

Since 2011, Boggs has occasionally looked for work as a mechanic. (R. 32.) However, he testified that he could not work full-time because he could not perform the normal day-to-day requirements of a mechanic's job. (*Id.*) He explained that following his stroke, he has no strength in his left arm, cannot use his left hand, and that his left leg goes out on him, sometimes causing him to fall. (R. 42, 46.) According to Boggs, he can only stand for a couple of hours at a time before his left leg gives out. (R. 42.)

He estimated that he could stand for about three hours total in an eight-hour day.  (R. 46.)  Boggs can walk a couple hundred feet at a time and avoids walking longer distances.  (R. 44, 47.)  He can walk while grocery shopping (which he does every three weeks) as long as he can lean on the cart for support.  (R. 47, 51.)  Boggs testified that he can lift ten pounds with his left arm and thirty pounds with his right arm, but that his arms "don't want to work with each other."  (R. 43, 47-48.)  This would make it difficult to perform certain functions of his previous job as a mechanic, such as lifting 150 pound brake drums.  (R. 48.)  Boggs has no trouble sitting and can get out of a chair without difficulty as long as the chair has arms.  (R. 47.)

Boggs also testified that he has been suffering from neck pain for a year and a half.  (R. 44.)  He has difficulty looking up for longer than ten seconds and looking side to side.  (R. 44-45.)  He explained that he has to be very careful while driving to make sure he sees the other drivers.  (R. 45.)   Boggs also suffers from left shoulder pain, which he did not experience prior to his stroke.  (R. 45-46.)  He testified that he has no strength in his left shoulder and cannot even rest his arm on the windowsill of his truck without his shoulder aching.  (R. 45.)  He takes Ibuprofen when the pain is severe.  (R. 55.)  His doctors have not ordered any testing or prescribed any medication for his shoulder pain.  (*Id.*)

At the time of the hearing, Boggs was still being treated by Dr. Francis about once every month or month and a half for his general health and blood pressure medication management.  (R. 52-53.)  His blood pressure medication had been keeping his blood pressure under control.  (R. 43.)  As long as he takes his medicine, he has no problems related to his blood pressure.  (R. 48.)  He also denied any side effects from

his medication.  (R. 42-43.)

Boggs has no ongoing issues with his breathing, though he tries to avoid direct exposure to fumes from fire trucks when possible.  (R. 48-49.)  Boggs did not know why his medical records included a reference to a ventral hernia because, to his knowledge, he never had one, nor had Dr. Francis placed any lifting restrictions on him as a result of a hernia.  (R. 55-56.)

Boggs lives by himself and does his own cooking and cleaning, though he can no longer vacuum with his left hand.  (R. 28, 50.)  He drives every day, usually to the fire station for coffee, or to the grocery store or pharmacy.  (R. 28.)  On a typical day, Boggs wakes up around 4:00 a.m., feeds the dog, and then watches the news for a couple of hours.  (R. 50.)  After that, he usually goes to the fire station for coffee, or he might do a chore around the house, like cut the grass.  (*Id.*)  He usually takes a nap around 2:00 p.m. and then gets dinner ready and watches TV until he goes to bed.  (*Id.*)  His meals usually consist of something simple like a hamburger.  (*Id.*)  Boggs can shower and dress himself, though with some difficulty due to the problems with his left hand.  (R. 30, 53.)  He can read and write, though he cannot write as clearly as he used to.  (R. 30.)  Boggs can no longer type on a computer as well as he used to because of the lack of control of his left hand.  (R. 51.)  He also has difficulty lifting up small objects like coins, drinking with his left hand, and opening jars.  (R. 52.)

Boggs smokes less than a half a pack of cigarettes per day, and has been doing so for the past year.  (R. 29.)  He occasionally drinks alcohol at social events or with family, but only has two beers about once a month.  (*Id.*)  Boggs explained that after having his stroke, he drank heavily, consuming four to six beers at a time every other

12

day.  (R. 29-30.)  He does not attend Alcoholics Anonymous meetings.  (R. 30.)

### D.  Medical Expert's Testimony

Medical expert ("ME") James McKenna, an internist, reviewed Boggs' medical records, heard Boggs' testimony, and offered his own testimony at the hearing before the ALJ.  The ALJ first asked the ME to list any of Boggs' severe impairments that he found to be supported by the medical records.  (R. 57.)

The ME first explained that Boggs has a history of uncontrolled hypertension, which resulted in his stroke and hospitalization in 2009.  (R. 57.)  The stroke involved the right side of the brain, which would have an effect on the left side of the body.  (*Id.*) The stroke was confirmed by both CT and MRI, and by the mild left-sided weakness observed by the neurologist.  (R. 57-58.)  A rehabilitation specialist also observed left facial weakness and very mild left hip flexor weakness.  (R. 58.)  The ME opined that the doctors likely did not want to check Boggs' maximum strength immediately following his stroke.  (*Id.*)

The ME went on to point out that Dr. Francis noted slight left-sided weakness in 2011, though he was unsure if that finding was "by history or by examination."  (R. 58.) By the time of the consultative exam, Boggs' motor strength was 5/5 in all limbs and he exhibited normal hand strength, normal gait, and a negative Romberg's test with some lack of balance.  (R. 59.)

The ME acknowledged that there was a reference to COPD in the record and that Boggs had admitted at times to heavy smoking.  (R. 59.)  But, at the time of his stroke, Boggs' lungs were clear and his chest x-ray was within normal limits.  (*Id.*)  As such, the ME did not find COPD to be a medically supported significant impairment.

13

(*Id.*)  Similarly, he found no objective support for Boggs' complaints of neck and shoulder pain.  (*Id.*)  The ME did find the ventral hernia to be supported by Dr. Francis' notation because that is something that is normally made by clinical diagnosis.  (R. 59-60.)

The ME voiced concerns about Boggs' polycythemia, or high hemoglobin levels.  (R. 60.)   According to the ME, a high hemoglobin level can lead to a high hematocrit level, which leads to sluggish blood flow and might require phlebotomy treatment.  (R. 60-61.)  But, because there were no recent blood test results in the record, the ME could not be certain if Boggs' hemoglobin level had decreased since he reportedly cut back on his smoking.  (R. 60.)  The ME also noted that Boggs had not undergone any treatment for his high hemoglobin level.  (R. 61.)

The ME assessed nicotine dependency and alcohol habituation.  (R. 61-62.)  He did not have enough information to assess alcohol dependency.  (R. 62.)  The ME confirmed that the stroke and hypertension were independent from each other and from the alcohol habituation, as was the ventral hernia.  (*Id.*)

Next, the ALJ asked the ME whether Boggs met or equaled any listings.  (R. 63.)  The ME responded that he did not, and explained that the main listing he considered was 11.04, which covers central nervous system vascular accidents.  (*Id.*)

The ME did conclude that Boggs would have functional limitations as a result of his impairments, particularly the hypertension, ventral hernia, and history of stroke.  (R. 63.)  The ME recommended that Boggs be limited to light work, that is, lifting twenty pounds occasionally and ten pounds frequently.  (R. 63.)  Despite allegations of falls, the ME believed that Boggs could walk, stand, and sit for six hours in an eight hour day,

and could push, pull, and use foot controls without limitations. (R. 63-64.) The ME would preclude the use of high ladders, ropes and scaffolds, but believed that Boggs could handle a five or six foot step ladder, ramps, and stairs. (R. 64.) On the whole, he would limit postural activities to frequent, as opposed to continuous, due to the combination of his impairments. (R. 64-65.)

The ALJ asked whether the ME's opinion would change if Boggs' hypertension was completely under control with medication. (R. 65.) If that were the case, the ME might allow occasionally lifting fifty pounds, and frequently twenty-five pounds (medium work). (*Id.*) However, according to the ME, the record did not in fact show that Boggs' hypertension was under control, in part due to his history of non-compliance. (R. 66.) The ME was not confident that Boggs would fully comply with his doctor's orders in the future and continue to take his medication as directed. (*Id.*) For this reason, he would not change his recommended functional limitations beyond the light level of exertion. (R. 66-67.)

The ME acknowledged that the Department of Disability Services concluded that Boggs could perform work at the medium level of exertion. (R. 67.) The ME disagreed with this conclusion, finding that the history of stroke, hypertension, and lack of compliance would make work at the medium level hazardous to Boggs. (*Id.*) In the ME's opinion, lifting fifty pounds would increase the risk of accelerating his blood pressure. (R. 68.) On the other hand, the ME disagreed with Dr. Francis' more restrictive RFC findings because the records showed that Boggs' left-sided weakness, which was more noteworthy immediately following the stroke, had improved over time. (R. 70-71.)

15

### E. Vocational Expert's Testimony

Vocational expert ("VE") Pamela Tucker also testified at the hearing.  After some additional clarification from Boggs, the VE classified his past work.  She classified his job as a heavy equipment mechanic as medium and skilled under the Dictionary of Occupational Titles ("DOT"), but heavy as Boggs performed it.  (R. 74.)  She classified his job as a firefighting equipment specialist as heavy and skilled under the DOT and as performed, and his job as a heavy equipment sales representative as light and skilled under the DOT, but medium as Boggs performed it.  (R. 74-75.)

Next, the ALJ asked the VE to consider an individual of the claimant's age, education, and work history who can perform work at the light exertional level; can stand and walk for a total of six hours in an eight-hour day; can sit for a total of six hours in an eight-hour day; can frequently climb ramps, stairs and short step ladders; can frequently crouch, crawl, stoop, kneel and balance; but cannot climb high ladders, ropes or scaffolds.  (R. 75.)  When asked if such an individual could perform Boggs' past work, the VE explained that he could perform the job of a heavy equipment sales representative as described in the DOT (light and skilled), but not as performed by Boggs (medium and skilled).  (R. 75-76.)  The individual could not perform any of Boggs' other past positions.  (R. 76.)  The individual could, however, perform other light, unskilled jobs in the national economy such as office helper (2,300 positions in Illinois, 90,000 nationally), mail clerk (3,000 in Illinois, 71,000 nationally), or labeler (8,000 in Illinois, 84,000 nationally).  (R. 76-77.)

The VE further explained that Boggs' skills from the heavy equipment sales representative position, such as influencing the opinions of others, communication skills,

and knowledge of the product and equipment, would be transferable to other sales jobs. (R. 78.)  Those jobs include motor vehicle and supply sales representative, which is light and semi-skilled (26,000 in Illinois, 235,000 nationally), and construction machinery sales representative, which is light and skilled (19,000 in Illinois, 130,000 nationally). (R. 78-80.)  According to the VE, those jobs would not require any additional skills and are within the RFC of the hypothetical individual described above.  (R. 79-80.)

Next, the ALJ asked the VE to consider the same hypothetical individual, but who was further limited to only frequently lifting overhead with the upper left extremity (no limitations on the right), and who must avoid close proximity to dangerous moving machinery and unprotected heights.  (R. 80.)  The VE testified that this individual would be unable to perform any of Boggs' past work due to the limitation on proximity to moving machinery, and there would be no transferable skills under the hypothetical.  (R. 81.)

Lastly, the ALJ asked the VE to consider another hypothetical individual of the claimant's age, education and work history who can perform work at the medium exertional level; can occasionally balance, climb ladders, ropes, and scaffolds; can frequently reach overhead with the left upper extremity, with no limitations on the right; and who must avoid close proximity to dangerous moving machinery and unprotected heights.  (R. 81.)  Again, the VE explained that this individual could not perform Boggs' past work due to the restrictions related to moving machinery.  (R. 81.)  The individual could, however, perform work in the medium, unskilled positions of laundry worker (11,000 in Illinois, 280,000 nationally), hand packager (7,000 in Illinois, 90,000 nationally), and cleaner (5,000 in Illinois, 110,000 nationally).  (R. 82-83.)  The VE

17

confirmed that all of her testimony was consistent with the DOT. (R. 83.)

Upon questioning by claimant's counsel, the VE clarified that Boggs' skills from selling trucks would be transferable to other fire truck or general truck sales positions, as opposed to automobile sales positions. (R. 83-84.) She also explained that Boggs would have learned general sales skills when he worked as a sales representative, such as speaking to the customers and explaining the product. (R. 84.) It is those skills that would be transferable to other sales positions. (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

This court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. §405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Charter*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks the evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he

"must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence … [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis under the Social Security Act

In order to qualify for benefits, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he or she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). At step five, the burden shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ applied this five step analysis here. At step one, the ALJ determined that Boggs had not engaged in substantial gainful activity since November 22, 2009, the

alleged onset date. (R. 11.) Next, at step two, the ALJ determined that Boggs suffers from the following severe impairments: status post cardiovascular accident and hypertension. (R. 11.) Also at this step, the ALJ concluded that Boggs' COPD, shoulder, and neck problems, did not cause more than minimal functional limitations, and that his depression and anxiety, though briefly mentioned in the record, were non-medically determinable impairments. (R. 11-12.)

At step three, the ALJ concluded that Boggs does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. He paid particular attention to listings 4.00(H)(1), discussing hypertension, and 11.04, which covers central nervous system vascular accidents. (R. 12.)

The ALJ went on to assess Boggs' RFC. (R. 12-15.) In doing so, he reviewed the medical records from both treating and consulting sources, and considered the opinions of the agency physicians, Dr. Francis, and the ME. (R. 12-15.) He also considered the testimony of Boggs, as well as his written statements. (R. 15.) Ultimately, the ALJ concluded that Boggs has the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except that he could not climb ladders (other than short step ladders), ropes, or scaffolds. (R. 12.) He also found that Boggs could frequently climb ramps and stairs, crouch, crawl, stoop, kneel, and balance. (*Id.*)

Based on this RFC, and relying on the testimony of the VE, the ALJ concluded that Boggs could perform his past relevant work as a heavy equipment sales representative as generally performed in the national economy. (R. 15.) As a result, he entered a finding of not disabled. (R. 16.)

20

Boggs now argues that the ALJ erred by (1) not finding all of his impairment severe at step two; (2) by affording the opinion of Dr. Francis little weight; and (3) by not finding that the record supported a less than sedentary RFC.  We address each issue in turn below.

### C.    The ALJ's Step Two Finding is Supported by Substantial Evidence and Free from Legal Error.

Boggs first asserts in a conclusory fashion that the ALJ should have found his COPD and chronic neck and shoulder pain to be severe impairments at step two.  (Pl.'s Brief at 6.)  Again, the ALJ determined that Boggs' status post cardiovascular accident and hypertension were severe impairments, but found that the record did not show that his COPD, neck or shoulder pain caused any more than minimal functional limitations. We find no error in this finding.

At step two, the ALJ is tasked with assessing the medical severity of a claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  "[A]n impairment or combination of impairments is considered 'severe' if it significantly limits an individual's physical or mental abilities to do basic work activities."  Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 at *1.  It is well settled that step two of the ALJ's analysis is "merely a threshold requirement."  *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010) (*quoting Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999)).  "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process."  *Castille*, 617 F.3d at 926-27.  Thus, "the determination of whether a particular impairment is severe or not is of no consequence to the outcome of the case where ... the ALJ recognized other severe impairments and so proceeded

with the full evaluation process." *Willis v. Astrue*, 10-207-CJP, 2011 WL 2607042, at *9 (S.D.Ill. July 1, 2011).

Here, where the ALJ found severe impairments at step two, we need not be concerned with his decision to exclude other impairments at that step as non-severe. What is more, the ALJ provided a sufficient explanation for that decision. With respect to COPD, the ALJ pointed out that a chest x-ray was unremarkable and Boggs' lungs were clear on exam. As for the neck and shoulder pain, the ALJ noted that Boggs has treated that pain effectively with over-the-counter medication. For these reasons, the ALJ's conclusions at step two are free from error.

## D. The ALJ's RFC Assessment is Supported by Substantial Evidence and Free from Legal Error.

Boggs' remaining arguments relate to the ALJ's determination that he can perform work at the light level with some additional limitations. Boggs first takes issue with the ALJ's treatment of Dr. Francis' opinion. He also argues that the medical evidence of record supports a less than sedentary RFC.

To begin, the RFC is the most a claimant can still do despite his mental and physical limitations. 20 C.F.R. § 404.1545. The ALJ will assess the RFC based on all of the relevant evidence in the record and must consider all medically determinable impairments, both severe and non-severe. *Id.*

In fashioning the RFC here, the ALJ acknowledged Boggs' complaints, and went on to assess the medical records in the file. He reviewed the opinions of the treating physician, the consulting physician, and the state agency reviewing physicians. He ultimately decided to give the opinion of Boggs' treating physician Dr. Francis "little

weight." (R. 14.) Boggs takes issue with this decision.

Boggs is correct that "[a] treating physician's opinion is entitled to controlling weight if it's supported by medical findings and consistent with substantial evidence in the record." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). If the ALJ decides not to give a treating physician's opinion controlling weight, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion to determine what amount of weight to afford the opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)). If the ALJ decides to discount the physician's opinion after considering these factors, the decision will stand "so long as the ALJ minimally articulate[d] his reasons - a very deferential standard that [the Seventh Circuit has], in fact, deemed lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (quotations omitted).

As discussed above, Dr. Francis opined, among other things, that Boggs could frequently lift ten pounds, but never more than twenty, and could not stand for more than fifteen minutes at a time or sit for more than thirty minutes at a time. She attributed these limitations to weakness on the entire left side of Boggs' body and poor strength in his left shoulder and elbow. In discounting this opinion, the ALJ commented on the relatively low number of treatment sessions between Dr. Francis and Boggs (three over ten months according to the ALJ). The ALJ also acknowledged that the record only included clinical examination findings from the physical examination at Boggs' initial visit

on May 11, 2011.[1]  On that date, although Dr. Francis noted a history of left-sided weakness (and ultimately assessed the same), upon physical examination, Boggs exhibited normal range of motion of the back, upper and lower extremities.  Dr. Francis found no abnormalities in those regions and documented Boggs' gait and motor strength as normal.  In deciding to afford Dr. Francis' opinion little weight, the ALJ was permitted to rely upon the inconsistency between her opinion and her own contemporaneous treatment records, as well as the overall absence of supportive clinical findings.  *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) ("[I]f the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it.").

The ALJ also cited to inconsistencies between Dr. Francis' opinion and the consultative exam performed by Dr. Simon.  Though Dr. Simon did find some decreased range of motion of the neck and left shoulder, he assessed full motor strength, and a normal gait and neurological examination.  In the ALJ's view, Dr. Simon's exam did not support the severe limitations recommended by Dr. Francis.  Lastly, the ALJ acknowledged that the ME, whose opinion he afforded significant weight, had specialized knowledge of the disability program, thereby implicitly citing to Dr. Francis' lack of specialized knowledge.[2]  *See* 20 C.F.R. § 404.1527(c)(6).  All of

---

[1] The physical examination section of the record from the March 26, 2012 visit was not completed. (R. 308.)

[2] This lack of specialized knowledge might be further evidenced by Dr. Francis' failure to understand the question regarding Boggs' abilities to sit, stand, and walk in an eight-hour work day.  (R. 320.)

these reasons offered by the ALJ for discounting Dr. Francis' opinion are sufficient to satisfy the lax standard applied upon review.

Boggs next argues that the record supports a less than sedentary RFC. In support of this argument, he first cites to his history of uncontrolled hypertension. Boggs is certainly correct that the record includes numerous high blood pressure readings and a history of hypertension. But, to the extent he is arguing that the ALJ failed to properly consider his hypertension, he has fallen short.

First, the ALJ was certainly aware of Boggs' history of hypertension, having found it to be a severe impairment at step two. The ALJ was also informed by the ME that because Boggs' hypertension was uncontrolled, he would be unable to perform more than light work. In fashioning the RFC, the ALJ afforded the opinion of the ME significant weight, thus taking into account Boggs' limitations associated with his hypertension. What is more, Boggs has not cited to any objective medical evidence showing that his hypertension causes more severe limitations than those accepted by the ALJ.

Boggs does cite to his own allegations of limitations set forth in a function report and at the hearing, arguing that those limitations support a sedentary RFC. But, the ALJ ultimately found Boggs' allegations regarding the severity of his impairments to be less than credible. Although the ALJ's credibility determination was far from perfect, we cannot say that it was patently wrong. *Bates*, 736 F.3d at 1098 ("An ALJ's credibility determination is entitled to deference, and we will overturn a credibility finding only if it is patently wrong.").

Here, the ALJ first pointed out the inconsistencies between Boggs' allegations

and the objective medical evidence. He also noted that following his stroke in 2009, Boggs did not seek treatment for any symptoms until May 2011. Elsewhere in the opinion, the ALJ commented that Boggs' shoulder and neck pain were effectively treated with over-the-counter medication. And, while the ALJ certainly could have afforded Boggs' allegations more weight in light of a significant work history, *see Hill v. Colvin*, --- F.3d ----, 2015 WL 7785561, at *5 (7th Cir. Dec. 3, 2015), on this record, his decision not to do so does not rule the day. On the whole, the ALJ's decision is supported by substantial evidence and free from legal error.

## III. CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted. It is so ordered.

**ENTERED:**

**Michael T. Mason**
**United States Magistrate Judge**

**Dated: December 16, 2015**